May it please the Court, Steve Berman, on behalf of the Volkswagen dealers, I'd like to resume in three minutes. And I apologize for being seated, I couldn't figure out a way to do this standing up. I'd like to start with three issues. One is what I would call the exposure issue. The second is the relevance of whether Volkswagen could have made clean diesels to begin with. And the third is the proper application of the remoteness factors set forth by the Supreme Court in analyzing proximate causation. So first, let me talk about the exposure issue. The District Court ruled that proximate cause was lacking because the exposure of the fraud was what caused the harm and not the fraud itself. And I'd like to liken this to a Ponzi scheme. People who are victims in a Ponzi scheme, they go about their lives every day, they have no idea that they bought into a fraud, and one day the fraud is exposed. No court, I submit to you, would hold that they can't sue because what harmed them was the exposure of the fraud as opposed to their underlying investment, which was fraudulent. Well, but what is the underlying harm here? Because it seems like when your client was selling the cars that it turns out later, I guess they shouldn't have been selling because there had been a violation of the law or at least alleged violation of the law. You could have continued to sell them and you wouldn't have been out. It's only when the emissions fraud was discovered that then your client was harmed. That seems to distinguish this case from the example you were given about the Ponzi scheme. No, because in this case, Your Honor, we invest, your clients invested in a line of cars that Volkswagen promised would go forward in the future. These Volkswagen diesels became the heart of the franchise. The coffee at the Starbucks is our client testified, and that's in the briefs before you. And we were harmed because we should have been given clean cars and we weren't. And so the harm happened at the beginning when we were given these fraudulent cars. So is that the damage claim you have? I thought your damage claim was the lost profits from being able to sell these vehicles. Well, that's the measure of our damage. So we're measuring our damages. But let me back up because the argument you just made seems to be that, hey, it turns out when people discovered that fraudulent emissions vehicles were being sold, our brand image was tarnished. But that doesn't seem to be that. I mean, that might be a different claim, but I don't see that claim in in this complaint unless I'm missing it. Are you claiming damage to your brand image as a dealership? We're claiming, Your Honor, damages that really are twofold. One, we would have had a stream of service revenue. In fact, dealers make most of their money, as we know, when we take our cars from charging us to fix the cars. And our damage expert at ER 392-394, and the judge that sustained his report, was able to model if the cars had not been fraudulent and if they had gone forward to 2027, which Volkswagen promised they would have been in the market that long, we would have made hundreds of millions of dollars collectively for all the dealers on service revenues. But those cars actually are ultimately going to get into the market or maybe already have gotten into the market, aren't they? Weren't they all retrofitted and then sold? Okay, so there's several streams of cars that would have been in the market. First, there would have been sales from 2015 forward. And Volkswagen was projecting that they were going to increase sales of these cars to the tune of 800,000 cars. All those sales are gone. It never happened. All the servicing that would have been attendant with those cars never happened. If they had sold us clean diesels, the franchisees would have had those revenues going forward. Then, 388,000 cars were taken off the road because of the fraud. They were fraudulently on the road. We lost all the service revenue from those cars. Most of those cars are just gone. They're not retrofitted. They were bought back, and they're off the road. So we've lost that revenue. So those are the types of revenues that we lost. And we claim that they were lost because the whole thing was a fraud to begin with. And that, I guess, dovetails to the issue of whether it matters whether Volkswagen could have delivered clean cars to begin with. Judge Breyer ruled, well, there's no causation here because you weren't entitled to keep selling dirty diesels. That's not the claim we made. And you couldn't prove that Volkswagen could have ever made clean cars. And I take issue with that because whenever there's a fraud, or most times when there's a fraud, the fraudster can't deliver on the promise. That's the nature of fraud. So the fact that Volkswagen may not have been able to make clean cars, that doesn't somehow vitiate the fact that our clients were defrauded at the outset. Did the dealerships have a contract with Volkswagen that guaranteed them a certain inventory to be able to sell each year? So the dealers had a dealership agreement that's in the record before the court. And what the dealership agreement promised was that Volkswagen would supply the product. In this case, diesel vehicles. But was there a guarantee of how much, how many cars would be provided? Each dealer would get an allocation based on the amount. But you guaranteed a certain number. That's my question. Guaranteed an allocation based on whatever number Volkswagen produced in a given year. Let's say the workers all went on strike. Volkswagen couldn't build, you know, they said, hey, we're planning to build 8,000 cars this year. Turns out they could only build 800 cars that year. You would have been guaranteed an allocation of those 800, but your allocation would have been 10% of what had been originally projected, correct? That's right. And that would be an out in the dealership agreement. It's saying that, you know, if there's strikes or there's issues that prevent us from manufacturing cars, that's an out to. But my point is, at the end of the day, you were only guaranteed an allocation. It was never that, hey, we're going to guarantee. You didn't even have a minimum, did you, of saying we guarantee you you'll have at least 500 cars to sell. Your dealership will have at least 500. No, but what we put in the record is a number of things in that regard. Number one, there's an agreement that says Volkswagen will deliver these vehicles. And I agree with you. It doesn't specify a yearly amount. But what it does specify is that Volkswagen cannot engage in deceptive or unethical conduct in the performance of its duties. And that's what happened here. We had a property interest in having Volkswagen give us legal cars, not illegal cars. So how have you how have you accounted for the fact that had Volkswagen provided you with lawful TDIs, that they would have been much more expensive than what than what they provided to you? I'm not sure I understand the question. Well, you you've you've complained that that Volkswagen Volkswagen didn't deliver on the cars they promised to give you, which would have been which would have been EPA compliant cars in order to do that. Volkswagen's calculation. This is one of the reasons for the fraud was that they couldn't produce those cars that would have been that would have been viable in the market. So in order for them to do that, they would have had to increase the car. Let's make up a number. Three thousand dollars per car. That certainly cuts into your sales and your profits. Have you accounted for that here? Our damage expert did not, because, again, I don't think we have to go back and try to figure out what Volkswagen would or could have done because of the line. All we have to do is to say, if you had delivered on your promise and we would continue to have TDI vehicles going forward in the future, we would have sold new cars, we would have serviced new cars, we would have serviced old cars. And that's what happened here. OK, I want to make sure I got I got this right. So you're telling us that you do not have to account that you may assume for purposes of your suit and your damages that the TDIs were provided to you at the price at which they were provided to you. But they would have been EPA compliant. That's right. I don't think the burden is on us. Well, but it's a little odd when it seems like the dealership in some ways benefited benefited from the fraud. So I don't know. I mean, unwittingly, apparently. But you were able before the fraud was discovered, you were able to sell more cars than you should have been able to sell. Because, you know, to judge by these points, it would have cost more and therefore you wouldn't have sold as many. So the fact that you benefited from the fraud, now you're coming back and saying, wait, we want that same benefit from the fraud after the fraud was discovered. That seems to be the argument. Well, there's only one damage report in the record. And that's our damage report, which models what would have happened if compliant cars had been delivered. It seems to me, your honor, it's on Bosch's side of the V. They have the burden of trying to use the benefit as mitigation. And they were they were they could have done that and they chose not to. Well, the question here, I agree with you, except for the fact that the question here goes to causation. And I think that's what we're that's what the district court was struggling with. And I think that's what we're struggling with. There were two victims here in this scheme. You have the consumers and the dealers. No one would say that because the fraud was exposed, that the consumers somehow didn't have approximate costs. Right. They were harmed just like we were from the outset when we were subject to this to this scheme. And I represented the consumers and the settlement team. No one made this exposure argument. But Bosch didn't even make the exposure argument in its brief. I see I'm running out of time. I just in our view, there are three factors that the court is supposed to take in the remoteness analysis. One is, were there independent factors that caused the injury? And here I submit there's no independent factors. The fraud caused the injury here. When the fraud was disclosed, Volkswagen had to take these cars off the market. There was no independent factor here. The second is, is there a risk of duplicative recoveries not analyzed by the district court? We are the only ones who can sue for our lost profits. So there's no risk of duplicative recoveries. And third, the remoteness factor looks at, is there a more immediate victim? And again, as to the dealers losses, there is no more immediate victim. And I'll rest here unless you have other questions. Thank you, counsel. Yeah, we'll reserve time for rebuttal. And Mr. Bacuzzi. Thank you, Your Honor. Carmine Bacuzzi from Cleary Gottlieb for the Bosch defendant. I think we just heard, we've got a noise there. I was raising the desk so I could stand. Oh, there you go. Excuse me, Your Honor. May it please the court. The district court was correct in granting summary judgment to the Bosch defendants given plaintiff's failure to establish the existence of any cognizable RICO injury approximately caused by Bosch. While the district court found that there was no material issue of fact as to proximate causation, an additional independent ground was the lack of a cognizable injury to business and property as required by the RICO statute. I would like to start with the injury question, because it's common ground that 18 U.S.C. 1964 C requires an injury to a business or property interest. And again and again, this court, since Diaz. Well, counsel, on that point, I mean, I'm sort of surprised you're starting with that argument, because that seems like the weaker argument from my view where, I mean, the plaintiffs are claiming they lost the opportunity to sell and service cars. How how is that not on its face a property interest? Because the case law teaches you just don't look at the asserted injury at a very heightened, generalized level. So, for example, in the city of Almaty case, the court said you can't just say loss of money and therefore I'm in I'm in the game as to injury. But they're saying that they lost the ability to sell is this so-called terminated TDI line. But they didn't have the right to sell or an interest recognized that state law to sell the TDI line. Right. I mean, it seems like why would why why would the contract not have given them the right to sell that? Now, I agree from the questioning that they may not have had a right or a guaranteed right in a certain number of vehicles. But I would assume these dealerships had an exclusive right within some sort of geographic area to sell that line of products. Why isn't that a property? What they have under the agreement is a right to sell authorized product. But authorized product are VW vehicles that VW in its discretion creates. VW has gas cars. It has diesel cars. So there's no promise in that dealership agreement that they're going to get a line of TDI cars now or in the future. It's about, as your honor noted in your colloquy, an allocation of the cars that VW and its discretion manufacture. But that seems to go to causation. What's interesting about your argument now is that you're trying to pitch that as they didn't have a property interest at all. And that seems from my perspective, that seems a bridge too far from the from the argument. Well, that's we can go to causation as well. But I think if we start with the lack of a of a cognizable interest under state law, because where could they base that? They don't have it in the franchise agreement. It's exactly like the claim in the city of Almaty, where the court had to look at what the injury was because there was an extraterritoriality question. And there they said that the city that came to the United States to bring their lawsuit said we had money stolen from us overseas. And the court said, well, that's not an injury. What's your injuries? Well, we're losing money. And they say, how are you losing money? And he said, well, now we're in court trying to recover that money. And they said that claim to loss of money is just a downstream effect of the actual injury that we can't reach. And so here I would say it's your position that any time a plaintiff comes in and claims lost profits, that that therefore can't be a RICO claim because those lost profits are not an injury to business or property because they don't have a property right under state law. Is that it could know lost profits could potentially be. And that was that was the question that the judge focused on on the motion to dismiss. Let's take a step back. Originally, the claim in the suit. And this goes, I think, both to injury and the causation is that when the fraud was revealed, these dealers were left with unsellable affected vehicles, the vehicles that were noncompliant. And the judge said, yes, that is an infringement on your right to sell your property, according to the terms that you want to. And that could include lost profits. We went into discovery on that claim discovery revealed and the plaintiffs have been consistent about this below and up here. They have no losses as to the affected noncompliant vehicles that were in their inventory when diesel gate situation was exposed. Once the stop sale orders were lifted, they were able to go ahead and sell them at a profit. Some better than what they were doing before. And they otherwise recovered all their costs. So there are no claims based on the vehicles and inventory, which in that context could have had a hook to a lost profit component. But they didn't lose anything. So now what they're saying is, oh, well, I lost profits and the right to sell the line of TDI compliant vehicles through twenty seven. That, in fact, were never created, manufactured by Volkswagen. And there I say it falls both as a matter of that's not an injury to a business or property interest cognizable under state law, but also on the causation question that your honor raised before. And that teaches that you have to look at the injurious conduct and see how it relates to the claimed injury. And so on Anza, the conduct that the plaintiff was complaining of was that his competitor was selling product for lower prices. He said he was able to do that because he wasn't paying state sales tax in New York. And the court said nothing about the nonpayment of state sales tax required the lowering of prices that the plaintiff complains of was their injury in this case. So to hear nothing about Volkswagen's RICO conduct, alleged RICO conduct, not making compliant vehicles required them to make the decision that they wouldn't make compliant vehicles. As the judge focused, they probably couldn't. The evidence in the record, there's no evidence that they could produce compliant vehicles. But it was completely within their discretion to move towards electrification and more gas. And that's what they did. So you already have this attenuated causal chain. And then it's highlighted by the completely hypothetical exercise. The court would have to go through, which I think judge by your question went through, which is try to imagine what these compliant cars would supposedly look like. How much they would cost, whether the dealers would get an allocation of them, if they would be sellable and what they would make from them. That's the exact causation problem. That's one of the elements in the Mendoza factors, the Holmes factors about the inability to separate supposed injury from the defendant's conduct and other independent. But let me ask about that, because I agree that some of it's hypothetical, maybe even speculative, but it's not unforeseeable that one car would have been sold. At least one car compliant, you know, would have been sold. I mean, who knows how many. But why isn't that enough for them to show some injury, you know, and then it's a battle of the experts and becomes a jury question as to what can stand up. Foreseeability is not the test. Foreseeability has been specifically rejected in the Hemi and the Anza case. It's proximate causation. What was directly caused by the RICO conduct here? What was directly caused by the RICO conduct was the provision to these dealers of the noncompliant vehicles. No injury as those sold at a profit completely covered. And then they want us to they want the court to accept. OK, well, that's fine. But there's a bunch of compliant cars that may have been in some alternative world. And we're entitled to the profits of that through 2027. And that actually puts them in a better position than a Volkswagen had made the compliant cars to begin with. Because in the scenario where there's always compliant cars, Volkswagen always had the discretion under the franchise agreement. And as a manufacturer to stop the line and produce whatever kind of car it wants and then to allocate those out. So it's to go to the Ponzi scheme example that Mr. Berman started with. They're actually saying the Ponzi scheme ended. Well, I'm still entitled to 12 percent through 2027 as the Ponzi scheme continues to go forward. That has no basis in law or the case law. And it's also the theory they disallow. They say, look, we're not trying to claim damages as if the noncompliance was continuing. We just say. But again, it's not based on any rights in the contract. Any cognizable state law concept and completely divorced from the position. Our requirements put down by the Supreme Court and followed by this court. They're there. None of that is hinged or connected to those requirements. When they say I get this hypothetical compliant revenue stream that doesn't exist in their view. Would you agree that this case would be different if the dealership agreement guaranteed a minimum number of cars? If the dealership agreement guaranteed them that they'd get 500 cars. Turns out they sold 300 noncompliant cars, then had to turn everything back. Would they be able to claim damages under that and say, well, we still have damages for the 200 cars that we weren't able to sell? So the hypothetical is they had a guaranteed right to 500 diesel vehicles. And because Volkswagen stopped selling them or stop making those cars, then it sounds like it's a breach of contract claim. And remember, we're two steps removed. Disagreement, again, doesn't speak to diesel vehicles. It speaks to authorized product, which is. No, that's right. And I think that's part of the problem for the plaintiffs, from my perspective. But I'm just wondering if there were provisions of the contract that would clearly make this different. And one, the most obvious to me would have been a minimum requirement of vehicles that had to be provided. That would presumably then they would have damages for those, the loss of sale for those that hadn't been provided. But that's not in the agreement. That's correct. It's not in the agreement. And it's also interesting, right, because it shows them what we'd really be talking about. Certainly, I can't imagine a contract in the real world where Volkswagen was saying because their theory is quite expansive. It's not the 200 cars in your example that was in the agreement for the year. It's 2027, another seven years of this and more than a decade from when. Well, but presumably you could have had a contract that said every year, you know, you sign a contract to 2027 and every year you're going to get 500 of these. Potentially. But that's a different. Then we'd be in the land of breach of contract and you'd sort of fall afoul. A lot of the case laws, it says RICO is not about taking a breach of contract claim and turning it into a trouble damages theory because their non delivery of vehicles would have been the result of their inability to produce the vehicles. That's not the RICO conduct. The RICO conduct was the delivery of noncompliant vehicles. And that's really what they sort of what they did base their damages theory on. That's in their complaint. The lost TDI line comes up in later complaints. That was not in the original complaint. It sort of was was thrown in there, I think, as they realized, hey, we don't have any damages based on the stuff that was the actual product of the injurious conduct, the creation of noncompliant vehicles. I think if you then go to the the claims right to service bought back vehicles again, you stumble. The plaintiffs stumble on the same two steps. I do want to say because it's in the brief and I think we're right. That is not an injury to business. Recognize that state law. There's no state law that recognizes a general right to, you know, cars out in the public that you have a claim to be able to service those cars. But even putting that aside again, we're now several steps removed from the RICO conduct. So there was RICO conduct. There was a settlement as part of the settlement VW offered to people. Either we'll buy back the car or we'll fix the car. You have some people took it. Some people didn't. So you have an intervening choice of the consumer in terms of vehicles that came out of the system. One hundred thousand went back into the system. The buyback was through the dealers who were paid to process the buyback. And if someone's car was bought back, that gave the dealer an opportunity to sell them another car. And so if you think about the potential for duplicative recoveries going on and it is very important. Their own expert, when he talked about the buyback, said, I'm doing it on a class wide basis because it would be daunting and difficult to try to figure out to trace the stream of bought back cars and how that work to figure this out for any individual dealer. It can't be done. And that sort of problem proved problems. And it's really interesting, right, because the Supreme Court, this court talks about all these usually in the context of motions to dismiss. And they're finding that the plaintiff can't reach the bar approximate causation required by the statute here. They got their discovery. We got our discovery. It went on for two years. And they and it shows and their own expert says it. You can't show the entry here and you can't have the direct approximate causation that's required by the statute. So for all those reasons, this the judge below should be affirmed. He there's a statement in the brief that he didn't apply the three factors. He specifically talked about Canyon County, which itself applies the factors. Canyon County also makes very clear that the proximate causation analysis is not limited to the so-called situation of derivative injury. You don't need the so-called other more directly harmed plaintiffs. So Mr. Berman's arguments as to that really don't help their side. There was one potentially aggrieved party. That's what Canyon County says. And that's what's correct. And so for all those reasons, these claims fail as the lower court found. So unless you want to question. I think we have your argument. Thank you very much. Mr. Berman, you may give rebuttal. Thank you, Your Honor. Counsel said a lot of things about what would have happened. They would have gone to gas cars. He says, who knows what the world would have looked like. That's an argument at trial because of the record before this court in the district court is we have an expert opinion. Judge Breyer denied Daubert. And in that expert opinion, the expert opines based on statements made by Volkswagen. This was the most popular vehicle ever made by Volkswagen. It was early in its lifecycle. They had just introduced the Gulf in 2015 that has a minimum lifecycle under normal business practices, according to our expert of seven years. So we had a legitimate basis for a damage model showing that our dealers were, in fact, injured. The cases that he cited, Anza and Canyon, are both distinguishable because the plaintiffs in that case, according to the courts, were not direct victims of fraud. With respect to the injuries on the dealerships, we are direct victims of the fraud and the only victims. And unless you have any questions, Your Honor, that's all I have. Okay. Thank you. Thank you, Counsel, both for a very efficient argument. It was much appreciated. And we will submit that case and that concludes our arguments for this morning. Thank you, Your Honor. Thanks, Your Honor. Be safe. Thank you.
judges: Schroeder, Bybee, Nelson